IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DORA RAMIREZ, *ex rel.* G.R., a          )
minor,                                    )
                                          )
                    Plaintiff,            )          No. 14 C 6172
                                          )
        v.                                )          Magistrate Judge
                                          )          Maria Valdez
CAROLYN W. COLVIN, Acting                 )
Commissioner of Social Security,          )
                                          )
                    Defendant.            )

MEMORANDUM OPINION AND ORDER

Dora Ramirez,[1] on behalf of her son, G.R., filed this action seeking reversal of

the final decision of the Commissioner of Social Security denying her son's

application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act. 42 U.S.C. §§ 405(g), 1381 et seq. 42 U.S.C. § 1382c(a)(3)(A). The

parties have consented to the jurisdiction of the United States Magistrate Judge,

pursuant to 28 U.S.C. § 636(c). For the reasons stated below, Plaintiff's request to

reverse the Commissioner's decision is granted, and the case is remanded for

further proceedings consistent with this opinion.

---

[1] Dora Ramirez is also referred to as Corina Martinez in the record. (R. 213.)

# BACKGROUND

## I.  PROCEDURAL HISTORY

On April 26, 2012, Dora Ramirez filed an application for SSI on behalf of her minor child, G.R., who was born on June 27, 2003, alleging disability as of March 1, 2009. (R. 213-18.) The application was denied initially and on reconsideration, after which Ramirez filed a timely request for a hearing. (R. 99-101.) On September 25, 2013, G.R., represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. 40-67.) The ALJ also heard testimony from G.R.'s mother, Mrs. Ramirez. (*Id.*)

The ALJ denied G.R.'s request for benefits on January 29, 2014. (R. 16-34.) Applying the three-step sequential evaluation process, the ALJ found, at step one, that G.R. had not engaged in substantial gainful activity since April 12, 2012,[2] the application date. (R. 25.) At step two, the ALJ found that G.R.'s attention deficit hyperactivity disorder ("ADHD") and anxiety disorder were severe impairments. (*Id.*) At step three, the ALJ determined that G.R. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of any of the listings. (R. 25-26.) Accordingly, the ALJ concluded that G.R. was not disabled, as defined by the Social Security Act, since April 12, 2012. (R. 33-34.)

## II.  FACTUAL BACKGROUND

---

[2] The ALJ incorrectly lists the application date as April 12, 2012. However, the record indicates that the application date is April 16, 2012. (R. 204.)

G.R. was born on June 27, 2003, and was eight years old at the time of his application. (R. 204.) G.R.'s extreme behavioral issues were first documented in 2009. (R. 404.) On March 27, 2009, a three-year re-evaluation of G.R.'s Individualized Education Program ("IEP") was held with G.R.'s special education teacher, school psychologist, occupational therapists, speech and language pathologist, and educational consultant. (R. 515-38.) The IEP conference revealed that G.R. was extremely distractible during short testing with the educational consultant, and that he was impulsive and not focused. (R. 516.) Directions had to be repeated two to three times to G.R. in order to elicit a response. (*Id.*) Throughout testing, G.R. was off task ninety percent of the time. (*Id.*) G.R. talked and sang to himself, wiggled in his chair, pounded his test booklet, looked around the room, and did not make eye contact with the consultant. (R. 516.) According to Ms. Brennan, G.R.'s classroom teacher, G.R. was a bright and sweet student that was interested in schoolwork and performing well academically. (R. 518.) However, Ms. Brennan was concerned because G.R. seemed to have difficulty slowing himself down and paying attention in class. (*Id.*) Ms. Brennan also reported that G.R. often required having directions repeated, was easily distracted, began assignments before understanding the task, fidgeted often, made unnecessary comments/noises, and walked around the classroom at inappropriate times. (*Id.*)

Because teacher reports and examiner observations suggested attention concerns, both G.R.'s teacher and mother were asked to rate his inattentiveness and hyperactivity/impulsivity using the Attention Deficit Disorders Evaluation Scale –

Third Addition. (*Id.*) On this scale, to rule out ADHD in a school or home setting, scores must be above seven for both inattentiveness and hyperactivity/impulsivity. (*Id.*) G.R.'s teacher and mother rated his inattention at scores of three and two, respectively; and both rated his hyperactivity/impulsivity at a score of two, suggesting G.R.'s inattentiveness and hyperactivity in both settings was significant. (*Id.*) Specifically, G.R.'s teacher noted that G.R. blurted out answers, fidgeted during independent activities, did not wait his turn or stay on task during group activities, and left his seat often. (*Id.*) G.R.'s mother noted that he was very active at home, jumped from activity to activity, and often did not have the patience to wait for his turn or for instructions. (*Id.*)

Out of concern, G.R.'s mother sought help from G.R.'s primary care pediatrician, Dr. Joaquin Lopez, M.D. (R. 514.) On April 3, 2009, Dr. Lopez diagnosed G.R. with ADHD. (*Id.*) G.R. was referred to a psychiatrist and was to begin treatment with Dr. Mohammed Hamsi, M.D. in June of 2009. (R. 400.) In August of 2010, G.R. began therapy. (R. 404-11.) He was diagnosed with ADHD, sibling relational problems, and academic difficulties. (R. 410.) Subsequently, G.R. was referred for a follow-up psychiatric evaluation and in September of 2010, psychiatrist Dr. Marta Banegas, M.D., prescribed Concerta.[3] (R. 402-03.) On February 4, 2011, therapist Miriam Rosales completed a Mental Health Assessment Review ("MHAR"). (R. 436-39.) Ms. Rosales noted that G.R.'s mother reported that G.R. had made some improvement and was less aggressive; however, G.R. still

---

[3] Concerta is a "trademark for preparations of methylphenidate hydrochloride," which is "used in the treatment of attention-deficit/hyperactivity disorder." *Dorland's.*

engaged in fantasy play and had difficulty relating to others. (R. 436.) G.R. isolated himself, kept things bottled inside because he feared getting in trouble, and was hyperactive and impulsive. (*Id.*) G.R also had difficulty getting along with his baby brother. (*Id.*) Further, he would voluntarily soil himself because he would often wait until the last minute to use the restroom. (*Id.*) G.R. was assigned a Global Assessment of Functioning[4] ("GAF") score of 56, and was further diagnosed with a learning disorder. (R. 438.) On August 5, 2011, Ms. Rosales completed a subsequent MHAR. (R. 432-35.) Ms. Rosales noted that G.R.'s mother reported that G.R. had made improvements and was less impulsive and hyperactive; however, G.R. continued to have difficulties getting along with his siblings. (R. 432.) G.R. occasionally would hit his baby brother and had difficulty controlling his anger. (*Id.*) G.R. was also highly anxious and had difficulty sleeping at night. (*Id.*) He was worried about starting school and whether or not he was going to be able to see his friends. (*Id.*) He was assigned a GAF score of 58. (R. 434.)

A February 23, 2010 IEP revealed that G.R. had transitioned well from developmental kindergarten to a general first grade classroom and his educational achievement showed general improvement. (R. 756-57.) However, G.R. still had difficulty maintaining necessary levels of attention across settings. (R. 766.) He required assistance and one-on-one support to help him understand directions, organize materials and space in the classroom, and progress in his learning. (*Id.*) A

---

[4] Global Assessment of Functioning scale, is "a rating of psychiatric status from 1 (lowest level of functioning) to 100 (highest level), assessing psychological, social, and occupational functioning; widely used in studies of treatment effectiveness." *Dorland's.*

subsequent April 8, 2011 IEP revealed that G.R. was being treated effectively with Adderall XI[5] once per day. (R. 615.) However, G.R. had difficulty managing anxiety about out-of-the ordinary situations, such as classroom holidays or birthday celebrations. (R. 618.) During those times, he would shut down, not participate, and was not able to talk about being upset. (*Id.*) He also had recently experienced an anxiety attack at school. (*Id.*) A December 16, 2011 IEP revealed that G.R. continued to have behavioral issues. (R. 378-89.) G.R. was observed in his general education classroom to be on task ninety-two percent of the interval samples, compared to ninety-seven percent of his male peers. (R. 381.) He appeared to be prepared, attentive, eager to participate in classroom discussions, and raised his hand to offer answers. (*Id.*) However at times, he was a bit restless and displayed frequent motor activity by squirming in his seat, tapping his feet, and being disruptive to other students by asking them to pull his finger and making noises with his mouth. (*Id.*) On January 26, 2012, Ms. Rosales completed another MHAR. (R. 452-53.) Ms. Rosales indicated that G.R. continued to exhibit irritability and continued to have difficulties in managing his anger. (R. 453.) He was assigned a GAF score of sixty. (*Id.*)

On May 11, 2012, G.R.'s teacher, Ms. Amy Chyzy, completed a Teacher Questionnaire. (R. 261-68.) Ms. Chyzy indicated she had taught G.R. in all subjects for about six hours per day for eight months. (R. 261.) In regards to Attending and Completing Tasks, Ms. Chyzy indicated that G.R. had slight problems changing

---

[5] Adderall is a "trademark for a combination preparation of amphetamine and dextroamphetamine," which is "used in the treatment of attention-deficit/hyperactivity disorder and narcolepsy." *Dorland's.*

from one activity to another without being disruptive, completing class/homework assignments, completing work accurately without careless mistakes, working at reasonable pace/finishing on time; and obvious problems organizing things or school materials and working without distracting himself or others. (R. 263.) Ms. Chyzy noted that when G.R. was upset, he would shut down, stayed too angry to work, and needed time to calm down. (*Id.*) In regards to Interacting and Relating Well With Others, Ms. Chyzy indicated that G.R. had slight problems taking turns in a conversation, interpreting meaningful facial expression, body language, hints or sarcasm; an obvious problem expressing anger appropriately; and a very serious problem using adequate vocabulary and grammar to express thoughts/ideas in general everyday conversation. (R. 264.) Ms. Chyzy noted that G.R. often needed to sit away from other students and calm down, and sometimes needed to leave the classroom with the social worker. (R. 264). Ms. Chyzy also noted that G.R. yelled out when he was angry, stayed angry for long periods, and refused to explain what was wrong until given a lot of time. (*Id.*)

In the area of Moving About and Manipulating Objects, Ms. Chyzy observed no problems in that domain. (R. 265.) With regard to Caring for Himself, Ms. Chyzy indicated that G.R. had a slight problem responding appropriately to changes in own mood; and obvious problems in handling frustration appropriately, and identifying and appropriately asserting emotional needs. (R. 266.) Ms. Chyzy noted that G.R. knew when he needed to calm down but did not express himself, and that she did not know how to help him when she did not know what was wrong. (*Id.*) In

regard to Health and Physical Well-Being, Ms. Chyzy noted that G.R. did better if he was holding or pushing something and it seemed to help calm him down. (R. 267.)

At a consultative psychiatric examination on June 21, 2012, psychiatrist Dr. Ana A. Gil, M.D., S.C., diagnosed G.R. with ADHD and Separation Anxiety Disorder. (R. 460.) Dr. Gil noted that G.R. had a poor attention span, was hyper-talkative and hyperactive, had a history of anxiety symptoms, completing tasks, and clumsiness, had difficulty waiting for his turn in lines and games, sleeping at night, frequently interrupted others, and a history of crying spells. (R. 457, 459.) G.R. also had been suspended on one occasion for fighting with another child at school. (R. 457.) He felt extremely anxious in unfamiliar situations and frequently clung to his mother, which was evident during the exam. (*Id.*) G.R. also had severe anxiety when separated from his mother. (R. 459.) During the mental status examination, G.R. had moderate psychomotor agitation, was restless, and would frequently interrupt Dr. Gil. (R. 460.) He had poor attention span and Dr. Gil had to repeat questions to him. (*Id.*)

On July 5, 2012, state agency psychiatrist, Dr. Terry A. Travis, M.D., completed a consultative evaluation. (R. 70-74.) Dr. Travis opined that G.R. had a less than marked limitation in Interacting and Relating with Others, a marked limitation in Attending and Completing Tasks, no limitation in Acquiring and Using Information, Moving and Manipulating Objects, Caring for Oneself, and no limitation in Health and Physical Well-Being. (R. 81-82.)

8

On July 24, 2012, Ms. Rosales completed another MHAR. (R. 464-65.) G.R. presented with anxiety and irritability, and was more hyperactive than usual. (R. 464.) He also expressed more anxiety the past few sessions and worried about his well-being and family. (R. 464-65.) G.R. was assigned a had a GAF score of fifty-five. (R. 465.) On August 9, 2012, Dr. Banegas completed a follow-up psychiatric evaluation. (R. 489-91.) Dr. Banegas noted that G.R.'s social emotional problems had increased, and that G.R. had one episode where he spoke about wishes of death. (R. 488.) G.R. also told his peer he was going to die and ask "God" to cut him into pieces because he hated him. (*Id.*) G.R. appeared anxious, self-conscious, was unable to socialize at his age level with peers, and did not understand social cues. (*Id.*) During his mental status examination, he was alert and oriented times three. (*Id.*) He was cooperative, though restless anxious and when the topic of conversation raised his anxiety, he would become frustrated and get up from his chair and pace around the office or at times, stand by the door quietly. (*Id.*) Dr. Banegas also noted that G.R. was immature and at times presented with odd thought processes, mumbled to himself, was irritable, and had a history of tantrums when frustrated. (R. 488-89.) G.R. worried about being accepted by his peers. (R. 489.) He was further diagnosed with Pervasive Developmental Disorder, NOS and Mood Disorder, NOS. (*Id.*)

On November 12, 2012, school nurse Costillo, completed a Teacher Questionnaire. (R. 282-89.) Nurse Costillo observed G.R. six hours per day, for two months. (R. 282.) In regard to Acquiring and Using Information, Nurse Costillo

indicated that G.R. had slight problems comprehending oral instructions, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, and applying problem-solving skills in class discussions; and a serious problem in expressing ideas in written form. (R. 283.) Nurse Costillo noted that G.R. was independent in his work but often had to redo it because he rushed or did not follow written/oral directions. (*Id.*) In regard to Attending and Completing Tasks, Nurse Costillo indicated that on a weekly basis, G.R. had slight problems paying attention when spoken to directly, waiting to take turns, and organizing own things or school materials; and that on a daily basis, G.R. had slight problems focusing long enough to finish an assigned activity or task, refocusing to task when necessary, carrying out single-step instructions, carrying out multi-step instructions, changing from one activity to another without being disruptive, and working without distracting others. (R. 284.) On a daily basis, G.R. also had an obvious problem completing work accurately without careless mistakes. (*Id.*)

In the area of Interacting and Relating Well with Others, Nurse Costillo indicated that on a weekly basis, G.R. had slight problems expressing anger appropriately, respecting/obeying adults in authority, relating experiences and telling stories, and using language appropriate to the situation and listener; and an obvious problem making and keeping friends. (R. 285.) On a daily basis, G.R. had obvious problems following rules in games, sports, and in the classroom, and playing cooperatively with other children. (*Id.*) Nurse Costillo noted that G.R.

recognized when he was losing his temper, could relay his feelings, and would remove his desk for alone time. (*Id.*) Nurse Costillo also indicated that G.R. had a difficult time working with groups on assignments. (*Id.*) G.R. would sometimes fixate on ideas and did not like sharing ideas in reading or writing with the whole group. (*Id.*) In regard to Moving About and Manipulating Objects, Nurse Costillo indicated that no problems were observed in that domain. (R. 286.) In regard to Caring for Himself, Nurse Costillo indicated that on a weekly basis, G.R. had obvious problems handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, and using appropriate coping skills to meet daily demands of school environment; and that on a daily basis, G.R. had obvious problems responding appropriately to changes in own mood, and knowing when to ask for help. (R. 287.) Nurse Costillo noted that G.R. rarely asked for help if he did not understand and when he was frustrated, he rocked back and forth with his hands over his ears. (*Id.*) Nurse Costillo also noted that G.R. did a very good job relaying his feeling after the fact. (*Id.*) In regard to Health and Physical Well-Being, Nurse Costillo noted that G.R. suffered from ADHD and exhibited anxiety attacks at times. (R. 288.)

On December 13, 2012, state agency psychologist, Dr. David Gilliland, Psy.D., completed a consultative evaluation. (R. 80-84.) Dr. Gilliland opined that G.R. had a less than marked limitation in Acquiring and Using Information and Interacting and Relating with Others, a marked limitation in Attending and Completing Tasks,

and no limitation in Moving and Manipulating Objects, Caring for Oneself, or Health and Physical Well-Being. (R. 81-82.)

On January 23, 2013, therapist Ms. Ana Javier, LCPC, completed an MHAR. (R. 846-49.) Ms. Javier noted that G.R. continued to present with anxiety. (R. 846.) G.R. was afraid and needed his mother's constant reassurance. (*Id.*) He was irritable, and could not tolerate discomfort. (*Id.*) He had become aggressive when not given his way, and would punch walls or throw objects. (*Id.*) The last session he was unable to regulate his affect, screamed, and cried loudly; he was inconsolable for forty-five minutes. (*Id.*) He was also distractible, highly impulsive, and worried about his mother dying. (*Id.*) G.R. had a poor relationship with his father and was afraid of him. (R. 846.) He had poor social skills, poor eye contact, and impulsivity. (*Id.*) G.R. reported being rejected by his classmates and repeatedly stated, "I have no friends, they say I'm annoying." (R. 846, 848.) G.R. was assigned a GAF score of fifty. (R. 848.)

On October 11, 2013, G.R. was hospitalized at Riveredge Hospital due to becoming aggressive and irritable at school; he was screaming, crying, shouting, and yelling, made a suicidal comment, and sometimes hit himself when he became agitated. (R. 909.) While hospitalized, it was noted that he presented with delayed social skills and became very impulsive when triggered by schoolwork, becoming obsessive over small details. (R. 910.) It was also noted that G.R. had very limited social skills and a possible learning disability. (R. 912.) However, G.R. reported that he "don't exist," and when asked if he should be in the Partial Program, he replied

"Yes, I don't have friends at school and for suicidal, anger, and anxiety." (R. 916.) He reported worrying about his mother and he would want to hurt himself or others if he "continue[d] to have a miserable life." (*Id.*) He also reported that he felt angry all the time because he had been bullied at school. (*Id.*) He used intense and inappropriate language, and stated that he wanted to kill a boy who bullied him. (R. 916-17.) He stated he hated "school so much that I want to burn it down." (*Id.*) He growled, yelled, shouted at an examiner, and was verbally aggressive throughout the evaluation, and uncooperative most of the time. (R. 918.) G.R. appeared defensive, guarded, manipulative, and hostile. (*Id.*) His cognitive abilities indicated he was in the below average range, and he seemed to experience a wide array of behavioral, emotional, social, and academic difficulties. (R. 921-22.) He was also very scattered and had a low motivation toward treatment. (R. 914.) Over time, he became more calm and relaxed. (R. 930-46.)

On November 1, 2013, psychiatrist Dr. P. Phoungcherdchoo, M.D, noted that he continued to do well, was calm and relaxed, and the psychological testing was to be finished by November 4, 2013 for discharge. (R. 945.) G.R. was diagnosed with Mood Disorder, NOS, Pervasive Developmental Disorder, NOS, problems with primary support group, social environment, and educational problems disorder; and he was assigned a GAF score of forty-two. (R. 922.) Upon discharge, G.R.'s final diagnosis was Intermittent Explosive Disorder, ADHD, and Oppositional Defiant Disorder. (R. 946.)

## DISCUSSION

# I.  STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel,* 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue,* 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's

judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms,* 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## II.    ALJ LEGAL STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. A child is disabled if he or she has a "physical or mental impairment, which results in marked and severe functional limitations, and ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). The SSA employs a three-step analysis to decide whether a child meets this definition. 20 C.F.R. § 416.924(a). First, if the child is engaged in substantial gainful activity, his or her claim is denied. *Id.* Second, if the child does not have a medically severe impairment or combination of impairments, then his or her claim is denied. *Id.* Finally, the child's impairments must meet, or be functionally equivalent, to any of the Listings of Impairments contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

To determine whether an impairment is functionally equivalent to a listing, an ALJ must analyze its severity in six age-appropriate categories: (1) acquiring

and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(a). The ALJ must find an "extreme" limitation in one category or a "marked" limitation in two categories. An "extreme" limitation occurs when the impairment interferes very seriously with claimant's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3)(I). A "marked" limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e) (2)(I).

## III.   ANALYSIS

Plaintiff asserts that the ALJ erred by: (1) failing to discuss the opinion of Nurse Costillo; (2) not discussing or considering evidence showing limitations in the domains of Caring for Oneself and Interacting and Relating with Others; (3) failing to fully develop the record by neglecting to obtain medical expert review of Plaintiff's October 2013 hospitalization; and (4) improperly assessing Ms. Ramirez's credibility.

### A.   <u>Opinion Evidence</u>

Plaintiff argues that the ALJ improperly weighed the opinion evidence because she: (1) did not consider or weigh Nurse Costillo's opinion pursuant to the checklist of factors set forth in 20 C.F.R. § 416.927(c); and (2) did not fully evaluate the domains of Caring for Oneself and Interacting and Relating with Others. The Commissioner contends that the ALJ reasonably considered the record evidence in

making her findings, and although the ALJ did not specifically mention Nurse Costillo by name, she did reference the nurse's completed Teacher Questionnaire in support of her finding that Plaintiff had less than marked limitation in Acquiring and Using Information.

The SSA uses medical and other evidence to reach conclusions about an individual's impairment(s) to make a disability determination or decision as described in 20 C.F.R. §§ 404.1512, 404.1513, 416.912 and 416.913. SSR 06-3p. In addition to evidence from physicians, the SSA may use evidence from "other sources," as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function; nurses are considered "other sources." *Id.* Opinions from non-medical sources who have seen the individual in their professional capacity should be evaluated by using the applicable factors set forth in 20 C.F.R. 416.927(d). An ALJ should consider factors such as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion. *Id.* In this case, Nurse Costillo evaluated G.R. for six hours per day, over a span of two months. She gained insight into G.R.'s behavioral and mental impairments and completed a Teacher's Questionnaire.

Although the ALJ alluded to a portion of Nurse Costillo's findings in the Acquiring and Using Information domain, the ALJ failed to fully evaluate or weigh Nurse Costillo's Teacher Questionnaire. The ALJ referred to Nurse Costillo's opinion in only one sentence, noting that G.R. "has problems rushing through his work and not following directions." (R. 29). There was no discussion or analysis of the remainder of Nurse Costillo's eight-page opinion. The ALJ failed to even mention Nurse Costillo's other findings in any of the other domains, including obvious or serious problems noted with expressing ideas in written form; completing work accurately; playing cooperatively with other children; following rules; handling frustration properly; being patient; identifying and asserting emotional needs; responding appropriately to changes in his mood; using appropriate coping skills; and knowing when to ask for help. Although it is well settled that an ALJ does not need to address every piece of evidence in the record, the ALJ's failure to even mention these opinions, let alone discuss their significance or the weight they were to be given, leaves a significant gap in her reasoning. *See Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). On remand, the ALJ should more carefully consider Nurse Costillo's opinions in light of factors governing the opinions of non-medical sources.

### B.   Disregard of Evidence Demonstrating Limitations

Plaintiff contends that the ALJ failed to fully evaluate evidence related to the domains of Caring for Oneself and Interacting and Relating with Others. The Commissioner responds that in regard to Interacting and Relating with Others, the

ALJ acknowledged that Plaintiff got easily upset at school, particularly when there were class celebrations; however, the ALJ recognized that the outbursts appear to have subsided in frequency with time and proper medications. The Commissioner further responds that the ALJ mentioned Ms. Chyzy's Teacher Questionnaire, and that the ALJ is not required to address every piece of evidence in the record.

While it is true that an ALJ does not have to address every piece of evidence, "[a]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion." *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014). Simply parsing out a few statements of the medical evidence is not adequate to explain why contrary evidence does not persuade. This "sound-bite" approach to record evaluation is an impermissible methodology for evaluating the evidence. *Id.*

The ALJ mentioned Ms. Chyzy's May 11, 2012 Teacher Questionnaire that G.R. became easily upset at school, but then stated that the outbursts appear to have subsided in frequency with time and proper medications. However, the evidence the ALJ cited in support of this conclusion was the December 16, 2011 IEP, completed six months before Ms. Chyzy's questionnaire and eleven months before Nurse Costillo completed her Teacher Questionnaire. The later questionnaires indicated that G.R. had several problems in the Interacting and Relating with Others domain. The evidence also suggests that G.R.'s outbursts had not subsided, because as late as October 13, 2013, G.R. was hospitalized for an extreme outburst at school. On remand, the ALJ must more fully consider all of the

evidence of G.R.'s limitations in the domain of Interacting and Relating with Others.

With regard to the Caring for Oneself domain, Plaintiff argues that the ALJ ignored significant evidence that G.R. was limited in the areas of emotional wants and needs, and coping with stress. The Commissioner responds that the ALJ explained that G.R. had no problems in the domain of Caring for Oneself because he was capable of performing age-appropriate activities such as caring for his personal hygiene needs, including dressing, brushing his teeth, combing his hair, choosing his clothes, preparing simply foods like cereal and pizza, putting away his toys and clothes, helping around the house, and doing his homework. However, the Commissioner's response and the ALJ's determination neglected two out of the three prongs of the domain. In the domain of Caring for Oneself, the SSA considers how a child maintains a healthy emotional and physical state, including how well the child gets his/her physical and emotional wants and needs met in appropriate ways; how the child copes with stress and changes in his/her environment; and whether the child takes care of his/her own health, possessions, and living area. 20 C.F.R. § 416.926a.

In prefatory language, the ALJ listed all three aspects of the domain, but in finding that G.R. had no limitation, she conclusorily stated only that G.R. was capable of caring for his physical health and living area. The ALJ failed to discuss any of the record evidence suggesting that G.R. had limitations in his ability to satisfy his physical and emotional wants and needs in appropriate ways, and his

ability to cope with stress and changes in the environment, including the questionnaires completed by Ms. Chyzy and Nurse Costillo, and notes from his January 23, 2013 therapy session. Without more consideration or discussion, it is difficult to ascertain what level of limitation G.R. suffered. Upon remand, the ALJ should re-evaluate all of the relevant domains thoroughly.

## C. Development of Record

Plaintiff argues that the ALJ failed to fully develop the record because she neglected to obtain medical expert review of Plaintiff's October 2013 hospitalization. The Commissioner responds that the ALJ considered and discussed the records of Plaintiff's October 2013 hospitalization and reasonably concluded that when Plaintiff was discharged less than a month from the time of admission, he had successfully completed all of his treatment goals and objectives and he demonstrated an improved mood and focus. The Commissioner argues that the ALJ was not required to obtain medical expert testimony, considering that a consultative psychiatric examination had been obtained, and the record was reviewed by two state psychologists. The Commissioner contends that with this development of the record, the ALJ was not obligated to obtain medial expert testimony, considering all the record evidence.

The Commissioner, however, disregards the fact that the state reviewers' opinions were given before G.R. was hospitalized. Dr. Travis gave his opinion in July of 2012, and Dr. Gilliland gave his opinion in December of 2012. Because those opinions were based on an incomplete record, the ALJ may not give them

controlling weight without an expert medical opinion of the whole record. *See Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010) (concluding that a state agency consultant must have the benefit of reviewing the complete case record before being granted controlling weight); *see also* SSR 96-6p. The fact that G.R. had shown some improvement after his initial hospitalization gives no insight into the level of limitation that remained. Upon remand, the ALJ should obtain a medical opinion regarding G.R.'s October 2013 hospitalization.[6]

**CONCLUSION**

For the reasons stated above, Plaintiff's request to reverse the decision of the Commissioner is granted. The case is remanded to the Commissioner for further proceedings consistent with this order.

**SO ORDERED.**                          **ENTERED:**

**DATE:**    **September 12, 2016**        _____
                                         **HON. MARIA VALDEZ**
                                         **United States Magistrate Judge**

---

[6] Because remand is necessary for other reasons, the Court need not address Plaintiff's argument regarding the credibility of G.R.'s mother, Ms. Ramirez. However, it should be noted that the SSA has recently updated its guidelines governing the evaluation of symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (eff. Mar. 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. On remand, the ALJ should re-evaluate Claimant's subjective symptoms in light of SSR 16-3p.